IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION


| | | |
|---|---|---|
| SHERLENE HILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 2:05-CV-195 |
| | ) | |
| BRINK'S, INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |


## OPINION AND ORDER

This matter is before the Court on Defendant Brink's, Incorporated's Motion for Summary Judgment, filed on June 9, 2006. For the reasons set forth below, this motion is **GRANTED**. Accordingly, this case is **DISMISSED WITH PREJUDICE.**


BACKGROUND

Plaintiff, Sherlene Hill ("Hill"), brought suit against her former employer, Defendant, Brink's Incorporated ("Brinks"), alleging her employment was terminated based on her race and gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e, as amended by the Civil Rights Act of 1991, 42 U.S.C. section 1981a, and her age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. section 621 *et. seq*.

Defendant filed the instant motion claiming Hill was lawfully

discharged.   Defendant maintains there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. This motion is fully briefed and ripe for adjudication.


DISCUSSION

The standards that generally govern summary judgment motions are familiar.   Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In other words, the record must reveal that no reasonable jury could find for the nonmovant.  *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).   In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant.  *Anderson*, 477 U.S. at 255; *Nucor Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the movant has met this burden, the nonmovant

may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989).   "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'"  *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d  405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate.  In this situation, there can be "'no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Facts

In determining what facts this Court should rely upon in ruling on the instant summary judgment motion, this Court considers the requirements of Northern District of Indiana Local Rule 56.1. Local Rule 56.1 requires the party seeking summary judgment to include a statement of material facts in the memorandum or appendix accompanying his summary judgment motion, with appropriate citations. Local Rule 56.1 also provides that the party responding to a motion for summary judgment must include a statement of genuine issues together with appropriate citations. Failure to do so results in the Court accepting as true all properly supported facts presented in the moving party's statement of material facts. N.D. Ind. L.R. 56.1.

Defendant has produced a statement of material facts, and with rare exception, the facts presented by Defendant are adequately supported with appropriate citations to admissible evidence. Plaintiff, however, has responded to Defendant's statement of material facts with a section titled "Disputed Issues of Material Fact" rather than a statement of genuine issues. The mis-labeling would be only a minor error, if the content was indeed appropriate for a statement of genuine issues. Unfortunately for Plaintiff, her "Disputed Issues of Material Fact" section recites facts which are, for the most part, either unsupported by appropriate citation or irrelevant to the issues

-4-

before the Court.[1]  The "Disputed Issues of Material Fact" section also inappropriately includes a considerable amount of legal argument and speculation.  For those reasons, this Court has found that, with rare exception, the facts as stated in Brink's Statement of Material Facts must be accepted as true for purposes of the instant summary judgment motion.  Although Plaintiff's response brief is not in substantial compliance with Northern District of Indiana Local Rule 56.1, this Court has nonetheless accepted as true for purposes of the instant motion all facts included in Plaintiff's "Disputed Issues of Material Fact" that are both properly cited and relevant to the issues pending before this Court.  Accordingly, for purposes of the instant motion, the facts are as follows:

Brink's is engaged in the business of transporting, protecting, and storing the coin, currency, negotiable instruments and other valuables of its customers.  (Levine Aff. at ¶ 3).  Brink's dispatches armored vehicles on daily runs to customer locations according to pre-determined routes and strict time schedules that are based on customer requirements and security needs.  (*Id.* at ¶ 4).   The armored vehicle is staffed by a driver, messenger, and sometimes a guard.  (*Id.* at ¶ 5).  Brink's employees are at-will, and receive notification of this fact upon hire, through the Handbook for Brink's Personnel

---

[1]Many items are not cited at all.  Others are cited, but the materials cited are either not provided for this Court's review, or do not support the contention in the brief.  Irrelevant facts include, but are not limited to Hill's marital status, number of children, and number of grandchildren.

("Handbook").  (*Id*. at ¶ 6).  Hill received and signed for a copy of the Handbook upon her employment at Brink's.  (*Id*. at ¶ 8, Ex. B; Hill Dep. at 29-30).

The driver position is the entry-level position for Brink's applicants.  (Levine Aff. at ¶ 9).  The driver is stationed in a separate compartment of the vehicle from the messenger and the guard, for safety reasons. (*Id*. at 10).  Brink's business operations revolve around safety and security.  (*Id*. at ¶ 11; Hill Dep. at 37, 53).  To that end, Brink's takes the safety and security of the crew, the armored vehicle, and the general public extremely seriously.  (*Id*). In order to ensure the safety and security of the crew, the vehicle and the general public, Brink's armored vehicle employees must follow detailed rules, regulations and procedures established by Brink's pursuant to the Department of Transportation's ("DOT") Federal Motor Carrier Safety Regulations ("FMCSR").  (Levine Aff. at ¶ 12).

Each driver must pass a written driver's examination, road test and medical examination, as well as undergo drug tests, all required under the FMCSR.  (*Id*. at ¶ 13).  The driver must possess a current valid DOT certification, and is primarily responsible for operating the armored vehicle safely in accordance with all applicable traffic rules and regulations.  (*Id*. at ¶¶ 14-15).  The driver is an essential part of the armored vehicle crew because he or she must ensure that the vehicle is operated according to schedule, on an exact route and according to security and safety regulations.  (*Id*. at ¶ 16).  The

driver acts as an armed "lookout" to protect the armored vehicle and the messenger and/or guard while they are making a delivery or pickup. (*Id*. at ¶ 17).  Thus, the driver provides an additional level of security for the armored vehicle, its contests and crew.  (*Id*. at ¶ 18).

Brink's armored vehicles weigh more than 26,000 pounds, and are thus capable of creating significant property damage and injury in the event of an accident.  (*Id*. at ¶ 19).  The Handbook provides that "[t]he primary duty of the Driver is to operate the armored vehicle . . . safely . . ."  (*Id*. at 19, Ex. A).  The Handbook also provides that the driver "shall maintain a safe driving record . . . A safe driver not only observes traffic rules and regulations but operates the vehicle in a defensive manner, avoiding accidents arising from the unsafe or inattentive acts of other drivers and pedestrians." (*Id*).

The messenger exercises immediate supervision over the armored vehicle and its crew during the run.  (*Id*. at ¶ 20).  The messenger performs his or her duties from the rear compartment of a 2-compartment armored vehicle, and depends for his or her safety and security on the driver following all applicable instructions and allowing him or her immediate access to the armored vehicle after the delivery or pick-up has been made.  (*Id*. at ¶ 21).

Armored vehicle crew members at Brink's Hammond, Indiana branch are dispatched in teams of two, consisting of a driver and a messenger.  (*Id*. at ¶ 22).  The branch manager and assistant branch

manager are responsible for scheduling armored vehicle employees to a crew and assigning each crew to a route. (*Id*. at ¶ 23). Both the scheduling of crew members and the specific run may vary daily depending upon the needs of the branch. (*Id*. at ¶ 23).

Brink's has established and vigorously maintains comprehensive Equal Employment Opportunity policies. (*Id*. at ¶ 24). The Brink's Equal Employment Opportunity Policy ("EEO Policy") explicitly prohibits discrimination on the basis of race, color, sex, religion, age, national origin, physical or mental disability and veteran status. (*Id*. at ¶ 24, Ex. D). Brink's requires all branch managers to post notices of its EEO Policy conspicuously in the workplace. (*Id*. at ¶ 26). These notices reiterate Brink's policies against discrimination and harassment of any kind and encourage employees to report any such incidents to management. (*Id*. at ¶ 26). At the Hammond, Indiana branch, these notices are conspicuously posted as required. (*Id*. at ¶ 27).

To encourage and allow employees to report workplace problems to management, Brink's has established, and aggressively promotes, a "Direct Access" procedure. (*Id*. at ¶ 28, Ex. D). This procedure enables employees to file complaints of any nature directly with Brink's senior vice president of human resources. The senior vice president of human resources subsequently investigates the charge or designates another appropriate individual to do so. (*Id*. at ¶ 29, Ex. D). Brink's requires all managers to make Direct Access forms easily

accessible to all employees.  (*Id*. at ¶ 30, Ex. D).

In addition to the Direct Access process, Brink's also requires that "Speak-Out Sessions" be conducted at all branches, allowing employees to present any questions or problems whatsoever to management.  (*Id*. at ¶ 31, Ex. D).  Brink's also has an "Employee Appeal Procedure" which sets forth numerous steps whereby an employee can meet with all managers in the chain of command up to the corporate vice president to present and resolve problems.  (*Id*. at ¶ 32, Ex. D).  This procedure also allows employees to have their concerns reviewed by the Employee Relations Department if dissatisfied with the decision of the corporate vice president.  (*Id*. at ¶ 33, Ex. D).

Brink's hired Hill on September 5, 2000, as a part-time driver at its Hammond, Indiana branch.  (Levine Aff. at ¶ 36, Ex. E, Hill Dep. at 40).  She was 43 years of age at the time of her hire.  (*Id*).  Hill was promoted to a full-time driver on March 19, 2001, and she received annual salary increases throughout her employment. (*Id*).

Hill was aware of Brink's Equal Employment Opportunity, Sexual Harassment, Speak-Out Sessions, Employee Appeal Procedure and Direct Access policies.  (*Id*. at ¶ 34, Hill Dep. at 30-33).  Hill never made any reports of discrimination through the means available to her prior to her termination,[2] and testified at her deposition that nobody used

---

[2]Hill complains that Direct Access procedures were not made readily available to her *after* her termination.  However, the Direct Access policy states that it is for *employees* of Brink's. Brink's did not agree to make this procedure available to those who have been terminated.  Accordingly, the failure to make the

racists, age-related, or gender-based remarks against her.  (Levine Aff. at ¶ 35, Hill Dep. at 99-100).

On September 13, 2000, Hill received specialized "Smith System" training on driving armored vehicles.  (Hill. Dep. at 34).  This training concentrated on, among other things, keeping safe distances between vehicles and changing lanes with a 26,000 pound armored vehicle. (*Id*. at 34-35; Levine Aff. at ¶ 37, Ex. F).  As a matter of course, Hill received Smith System retraining on September 13, 2001. (Levine Aff. at ¶ 38, Ex. F).  Brink's provided the Smith System training because it takes safe driving very seriously.  (Hill. Dep. at 37).  Brink's emphasizes safe driving because employees, and members of the public at large, have been killed and seriously injured in armored vehicle accidents.  (Levine Aff. at ¶ 39).  Because of the real potential for death or serious injury in the event of an armored vehicle accident, Brink's closely examines all armored vehicle accidents to determine if its drivers are able to operate these 26,000 pound steel and armor plated vehicles safely.  (*Id*).

Brink's also utilizes a vehicle monitoring system, called "Driver's Alert", which allows private citizens to comment on the performance of Brink's Drivers.  (Levine Aff. at ¶ 40, Hill Dep. at 51-52). "Driver's Alert" is designed to encourage safe driving by means of an 800 telephone number affixed to all Brink's vehicles which

---

Direct Access procedure available to Hill after her termination is not relevant here.

allows the public to report unsafe acts by Brink's drivers.  (*Id*).
An independent company receives these calls and reports them
immediately to Brink's, which then conducts an investigation and takes
appropriate action.  (*Id*).

While safety and security concerns are one of the reasons that
Brink's attempts to prevent armored vehicle accidents, financial
considerations are also a factor.  (Levine Aff. at ¶ 41.)  Accidents
cost money in repairs, lawsuits and the medical expenses of lost time
of injured employees.  (*Id*).

Armored vehicle accidents also negatively affect the timing of
Brink's armored vehicle runs. (Levine Aff. at ¶ 42).  Timing is
critical because Brink's seeks to minimize the time armored vehicle
crews are "on the street," and because customers expect to be serviced
at specific times.  (Levine Aff. at ¶ 42, Hill Dep. at 46).

Branch manager Brion Levine ("Levine"), when questioned about his
impression of Hill as an employee shortly after he became branch
manager in Hammond, stated that Hill "was a great employee at the
time."  (Levine Dep. at 22).  Nonetheless, Brink's terminated
Plaintiff's employment on September 28, 2004, when Levine lost
confidence in Hill's ability to perform her job duties safely and up
to Brink's expectations following her second accident in a 15-month
period, and considering the totality of the circumstances, including
the costs Brink's incurred because of her accidents. (Levine Aff. at
¶ 32, Ex. G).

-11-

It is undisputed that Hill was involved in an accident while driving a Brink's armored vehicle on June 20, 2003. (Levine Aff. ¶ 44, Ex. H). She failed to yield the right of way and rear-ended another vehicle. (*Id*). The driver of the other vehicle was taken to the hospital for treatment. (*Id*). Although it does not appear that the driver of the other vehicle actually filed a lawsuit against Brink's, Brink's nonetheless incurred a loss of $26,949.50 as a result of the accident.[3] (*Id*). Those expenses were allocated to the Hammond branch. (*Id*).

Levine became aware of the costs associated with Hill's June 2003 accident when the claim settled in April 2004, several months prior to Hill's September 2004 accident and subsequent discharge. (Levine Aff. at ¶ 45). Thus, when Hill had her second accident while driving for Brink's in September 2004, the costs of the first accident incurred by the Hammond branch were fresh on Levine's mind.[4] (*Id*). Hill was not aware of the settlement of the June accident until the time of her termination. (Hill Dep. at 70).

---

[3]Hill questions the severity of the injuries caused by this accident, but produced no evidence that indicates that Brink's did not actually incur the expenses it alleges. Accordingly, Brink's statement of its expenses incurred is accepted as true.

[4]Hill argues that the cost of the accident could not have been fresh on his mind because Levine testified that he did not review an employee's previous accidents until they had another one during his tenure in Hammond. (Levine Dep. at 77). Levine's testimony is not inconsistent with him being aware of the costs of settling Hill's earlier accident, and it is therefore accepted as true.

In addition, on May 28, 2004, Hill was the subject of a "Driver's Alert" complaint for making an unsafe lane change without using her signals, causing the driver of another vehicle to brake.[5] (Levine Aff. at ¶ 46, Ex. I). Hill did not see the form documenting the May 28, 2004 Driver's Alert until after her termination.  (Hill Dep. at 51). Hill is critical of Levine for not following up with the messenger riding with Hill during the alleged improper lane change that was the subject of the Driver's Alert, but Levine explained that there was no reason to check with the messenger because he would not have seen an improper lane change from his post.  (Levine Dep. at 60).  According to Levine, employees on whom Brinks receives complaints "are the ones who are actually in accidents."  (Levine Dep. at 60).

On September 23, 2004, Plaintiff made an improper right hand turn and hit a parked vehicle.  Plaintiff clipped the front driver's side signal light while pulling in to park in front of 841 Broadway. (Pl.'s Ex. A and B).  After this accident, Levine concluded that, as a result of her performance while driving Brink's vehicles during such a relatively short time frame, he had lost confidence in her ability to perform the duties of her position safely.  (Levine Aff. at ¶ 47, Exs. G and H).  Levine was concerned about Hill's unsafe lane movements and the cost Brink's incurred in connection with her

_____

[5]Plaintiff correctly notes that Brink's misconstrued the report as causing the driver to "slam on the brakes" when the report merely states "caller claims driver made an unsafe lane change, from left to right, without signals, causing caller to brake." (Levine Aff. at ¶ 46, Ex. I).

preventable accidents. (Levine Aff. at ¶ 48, Exs. G and H).  As a result, Brink's discharged Hill on September 28, 2004.  (*Id*).  During her deposition, Hill testified that she believed she was fired because she was "in the way, you know, of – as far as seniority."  (Hill Dep. at 69-70.)

While the record establishes that Hill had a part-time job driving a bus, and she was involved in an accident while driving the bus which was also due to improper lane changes, Brink's was not aware of this at the time of Hill's termination, and it was not a factor used in its determination to fire her.  (Hill Dep. at 10-12). Accordingly, Hill's bus driving accident is not material and need not be considered by this Court.

Similarly, there is a dispute between the parties regarding whether Hill was involved in an accident with her personal motor vehicle while she was employed at Brink's.  Brink's contends that Hill was involved in an accident, and Hill contends that she merely witnessed the accident of another.  Again, even if such an accident occurred, Brink's concedes that this was not known to it at the time the decision to terminate Hill was made.  Accordingly, the dispute is not material, and need not be considered by this Court.

Additionally, Hill has a conviction for an unsafe lane change from 1994, long before Brink's hired Hill, although it is not entirely clear whether this was known to Levine and played a roll in his decision to terminate her.  (Brink's Ex. J).  For purpose of this

-14-

summary judgment motion, this Court assumes that the 1994 conviction played no part in the decision to terminate Hill.

Upon her termination, Levin placed Amalia Agins ("Agins"), an African American female under the age of 40, on Hill's route. (Levine Aff. at ¶ 49.)[6]  This decision was based on Levine's previous experience working with Agins in Chicago.  (*Id*). While Hill alleges that Brink's had a seniority system for assigning runs, and Levine testified that "there is no such thing as route picks", this dispute is not material to the outcome.  (*See* Hill Dep. at 91; Agins Dep. at 26; Levine Dep. at 39).  Hill attacks Levine's choice of Agins for the position on the basis of Agins' testimony that she had difficulty getting along with a supervisor in Chicago, and that she had been disciplined for being tardy more than five times.  (Agins' Dep. at 19 and 41).

Levine was transferred from Brink's Chicago branch, where he held the position of assistant branch manager, to its Hammond, Indiana, branch, where he held the position of manager, on August 20, 2003. (Levine Aff. at ¶ 50).  Levine was moved to the Hammond branch, which had lost customers and was not profitable, to improve its financial condition.  (Id. at ¶ 5-51, Hill Dep. at 85-86).  In an effort to boost profits, Levine analyzed Brink's armored vehicle runs and

---

[6]Hill points out that Brink's had denied this fact in a response to interrogatories, but the response Hill cites to was not provided to this Court.  At any rate, the dispute is not material, as the parties now agree that Agins replaced Hill.

restructured them for greater efficiency by making both personnel and geographical route changes.  (Levine Aff. at ¶ 52).

Levine was responsible for hiring and firing branch personnel. (Levine Aff. at ¶ 53).  Accordingly, to enhance operations, increase profitability, and for disciplinary reasons, Levine discharged various employees.  (*Id.* at ¶ 53).  Levine discharged 27 people while he was the branch manager in Hammond, and hired or transferred to Hammond 25 individuals.  (*Id.* at ¶¶ 54-55).  Levine discharged 22 males from the Hammond branch and brought in 20 males.  (*Id.* at ¶ 56).  Levine discharged five females from the Hammond branch and brought in five females.  (*Id.* at 57).  Levine discharged seven African Americans from the Hammond branch and brought in seven African Americans.  (*Id.* at ¶ 58).  Levine discharged 17 Caucasians from the Hammond branch and brought in 17 Caucasians.  (*Id.* at ¶ 59).  Levine discharged 12 employees over the age of 40 from the Hammond branch and brought in 11 employees over the age of 40.  (*Id.* at ¶ 60).  Levine discharged 15 employees under the age of 40 from the Hammond branch and brought in 14 under the age of 40.  (*Id.* at 61).

While Levine was branch manager of the Hammond branch, seven Brink's employees were involved in a total of 11 armored vehicle accidents.  (Levine Aff. at ¶ 62, Ex. H).  After each accident, Levine performed a review to determine if the accident was preventable or non-preventable.  (*Id*).  If the accident was preventable, Levine determine what discipline, if any, should be given.  (*Id*).  The review

-16-

included an examination of past accidents to assess if there was a pattern of unsafe driving, a determination of whether there were any injuries, and the total costs incurred by Brink's as a result of the accident. (*Id*). In addition, Levine noted each employee's length of service in determining whether he maintained confidence in their ability to perform their job duties satisfactorily. (*Id*).

None of the 11 accidents that occurred during Levine's tenure resulted in death or serious injury. (*Id.* at ¶ 63, Ex. H). In fact, only five resulted in costs to Brink's of more than $5.00. (*Id*). Brink's incurred costs of greater than $1,500 in only two of the eleven accidents. (*Id*). Three were considered non-preventable. (*Id*).

Jason Craaybeek ("Craaybeek") had a preventable accident while Levine was branch manager. (*Id*. at ¶ 64, Exs. H and K). Although no costs were incurred as a result of the accident, Craaybeek was terminated because, upon reviewing his accident history, Levine noticed that he had two other preventable accidents in 2002. (*Id*). One of those accidents cost Brink's $15,129.88. (*Id*). Craaybeek is a Caucasian male born on January 21, 1970, and had been employed with Brink's since July 16, 1997. (*Id*).

James Bauske ("Bauske") had two preventable accidents while Levine was branch manager, for a total of three preventable accidents in a 7-month period. (*Id*. at ¶ 65, Exs. H and K). Bauske began working for Brink's in July of 1965. (Id). The length of Bauske's

employment factored into Levine's decision not to discharge Bauske until after his third preventable accident. (*Id*). Also shaping Levine's decision to terminate Bauske was Bauske's concession that he was a careless driver. (*Id*). Bauske is a Caucasian male who was born on February 22, 1944. (*Id*). Damon Rodgers ("Rodgers") had three non-preventable accidents while Levine was branch manager. (*Id*. at ¶ 66, Exs. H and K). In each accident, another vehicle struck Rodgers' armored vehicle while it was parked. (*Id*). Brink's incurred a total cost of $15 as a result of Rodgers' three accidents. (*Id*). Rodgers, an African American male born on January 15, 1969, was not terminated. (*Id*).

James Head ("Head") had two preventable accidents while Levine was Branch Manager.[7] (*Id*. at ¶ 67, Exs. H and K). One resulted in damages of $75.91 and the other resulted in damages of $14,613.29. (*Id*). Head, a Caucasian male born on August 26, 1948, was not terminated. (*Id*). The decision not to terminate Head was based in part on the fact that he had worked for Brink's since November 19, 1970, and had over 33 years of committed service to Brink's, and only three accidents throughout his employment. (*Id*).

---

[7]While Hill claims that Head also had seven Driver's Alert complaints, she does not provide appropriate citations for this fact, citing only generally to Exhibit G, a 33 page document consisting of safety process reviews for various individuals. This Court will not search the record for information that has not been properly cited by the parties. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in" the record).

Ronnie Williams ("Williams") had five preventable accidents since 1998, but only one during Levine's tenure as Branch Manger. (*Id*. at ¶ 68, Exs. H and K). That accident resulted in $1,351.09 in costs to Brink's. (*Id*). Levine did not terminate Williams because no one was injured in any of his accidents and the cost to Brink's was not significant. (*Id*). Williams is an African American male born on October 18, 1950. (*Id*).

Tracee Wilson ("Wilson") had two preventable accidents in two months while Levine was branch manager. (*Id*. at ¶ 69, Exs. H and K; Pl.'s Ex. G at 28-29). The total costs to Brink's for the two accidents was $2,569.68. (Levine Aff. at ¶ 69, Exs. H and K). Wilson was not terminated because no one was injured as a result of her accidents, which Levine found to be minor. (*Id*). Additionally, the accidents did not indicate to Levine that Wilson had fundamental driving problems. (*Id*). Wilson, a Caucasian female, was born on January 13, 1971. (*Id*). Wilson also had two Driver's Alert reports, but the timing and nature of those reports is unknown to this Court. (Pl.'s Ex. G at 28).


Hill's Title VII and ADEA Claims

Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e *et. seq*, prohibits discrimination against any individual with respect to compensation, terms, conditions, or privileges of employment, because of that individual's race, color, religion, sex

or national origin.  42 U.S.C. § 2000e *et. seq.*  The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).

Race, gender and age discrimination can be proved through either direct or indirect evidence of discrimination.  *Oest v. Ill. Dept of Correction*, 240 F.3d 605, 611 (7th Cir. 2001); *Robin v. Espo Engineering Corp.,* 200 F.3d 1081, 1088 (7th Cir. 2000).  Plaintiff, however, has not produced any direct evidence of  discrimination, and her claims are therefore evaluated under the *McDonnell Douglas* burden-shirting framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  To establish a *prima facie* case of discrimination, a plaintiff generally must show that she belongs to a protected class, that she was performing her job to her employer's satisfaction, that she suffered an adverse employment action, and that a similarly situated employee who was not a member of the protected class was treated more favorably than her.  *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 897 (7th Cir. 2003); *Richter v. Hook-SuperRx, Inc.,* 142 F.3d 1024, 1028 (7th Cir. 1998).  *See also McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1972).

If a plaintiff proves a *prima facie* case of discrimination, the burden  shifts  to  the  defendant  to  produce  evidence  of  a nondiscriminatory reason for its actions.  *See e.g. Curry v. Menard,*

-20-

*Inc.*, 270 F.3d 473, 477 (7th Cir. 2001).  If the defendant does so, the presumption of discrimination established by the *prima facie* case dissolves, and the plaintiff may attempt to demonstrate the reason proffered by the defendant was pretextual.  *Id.*  The ultimate burden of persuading the trier of fact that discriminatory animus caused her dismissal rests at all times with the plaintiff.  *Gonzalez v. Ingersoll Milling Machine Co.*, 133 F.3d 1025, 1032 (7th Cir. 1998).

Plaintiff's race, sex and age discrimination claims must fail on summary judgment because she has not produced evidence from which a reasonable jury could conclude that she has established a *prima facie* case of discrimination.  Additionally, Plaintiff's claims fail because she has not provided evidence from which a reasonable jury could conclude that Defendant's stated reason for terminating her is pretextual.

Prima Facie Case

Only two elements of the *prima facie* case are in dispute here: namely, whether Plaintiff was meeting her employer's legitimate expectations, and whether Plaintiff has identified any similarly situated employees outside the protected classes that were treated more favorably than herself.

Generally, a plaintiff must demonstrate that she is meeting her employer's legitimate expectations as part of her *prima facie* case in an employment discrimination case.  However, there are circumstances

where such an inquiry may more appropriately be postponed until after the employer has stated its legitimate non-discriminatory reason, and considered together with the issue of pretext.  The Seventh Circuit has stated the following:

> [I]n limited circumstances, a plaintiff may be able to meet the second part of the prima facie case without showing that he met his employer's legitimate expectations. As we explained in *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1404 (7th Cir. 1996), an individual who meets the other criteria for a prima facie case and also demonstrates that the employer's legitimate expectations were themselves pretextual can survive the first prong of *McDonnell Douglas*. Under those circumstances, the prima facie case is subsumed into one of establishing pretext under *McDonnell Douglas*'s third prong.  We have also considered this merger analysis appropriate in cases where the reason for the employee's termination was alleged to be a sham designed to hide the employer's discriminatory purpose.

*Brummett v. Lee Enterprises, Inc.*, 284 F.3d 742, 745 (7th Cir. 2002). *See also Hague v. Thompson Distribution Co.*, 436 F.3d 816, 823 (7th Cir. 2006)(reasoning that it is simpler to run through the analysis only once where the issue of satisfactory job performance must be analyzed at both stages of the *McDonnell Douglas* test).

Brink's expected Hill to be able to operate an armored vehicle in a safe manner, an expectation which is undoubtedly legitimate. Hill appears to contend that, although she was the subject of a Driver's Alert complaint and involved in vehicular accidents, others were as well but Hill was disciplined more harshly.  Because Hill is contending that Brink's disciplined her unfairly, this Court finds

this case to be one in which the inquiry into whether Hill was meeting her employer's legitimate expectations is more appropriately considered together with the issue of pretext.  Accordingly, Hill would not need not demonstrate that she was meeting her employer's legitimate expectations in order for the burden to shift to Brink's to state a legitimate reason for its decision to terminate Hill's employment if she otherwise fulfills her *prima facie* burden.

However, Hill remains unable to demonstrate a *prima facie* case of discrimination because Hill can not show that similarly situated employees are treated more favorably than her.  A similarly situated individual is one directly comparable "in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002); *see also Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005). The Seventh Circuit has stated that "[i]n determining whether employees are similarly situated, 'a court must look at all relevant factors, the number of which depends on the context of the case.'" *Peele v. Country Mut. Ins. Co.,* 288 F.3d 319, 330 (7th Cir. 2002)(citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-19 (7th Cir. 2000)).  The Seventh Circuit has also stated that:

> in disciplinary cases - in which a plaintiff claims that [she] was disciplined by [her] employer more harshly than a similarly situated employee based on some prohibited reason - a plaintiff must show that [she] is similarly situated with respect to performance, qualifications, and conduct . . . This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar

> conduct without such differentiating or
> mitigating circumstances as would distinguish
> their conduct or the employer's treatment of
> them.

*Radue*, 219 F.3d at 617-18 (citation omitted).

Hill contends that others African Americans, women and younger individuals had more accidents than her, but were not discharged. But, Brink's decision was not made merely on the basis of the number of accidents Hill was involved in. According to Brink's, the decision was also based on length of employment, and amount of damages involved in accident, and time between accidents. Hill argues (although she provides no relevant authority to support her argument) that for purposes of determining if Hill has identified a similarly situated employee, each of these criteria should be ignored by the Court. This Court disagrees. The Seventh Circuit has previously recognized that the length of employment relationship may be sufficient to prevent two individuals from being considered similarly situated. *Taylor v. ADS, Inc.*, 327 F.3d 579, 781 (7th Cir. 2003)(noting that an individual was not similarly situated to Plaintiff for at least two reasons, one of which was that the individual had been driving for defendant several years longer than the plaintiff). And, the Seventh Circuit has indicated that common sense should be utilized in determining of what factors are properly considered. *See Snipes v. Ill. Dept of Corrections*, 291 F.3d 460, 463 (7th Cir. 2002)("Requiring that the plaintiff establish these similarities is simply common sense, as '[d]ifferent employment decisions, concerning different employees,

-24-

made by different supervisors sufficiently accounts for any disparity in treatment, thereby preventing an inference of discrimination.'"). Common sense dictates that if an individual has two accidents in 15 months (as Hill did) as opposed to two accidents in 15 years, they are not similarly situated.  Therefore, the time between accidents is also an appropriate factor for this Court to consider when determining whether Hill has identified any similarly situated employees.  And, common sense also indicates that the cost incurred as a result of an accident could be a factor differentiating two otherwise similar employees.

With regards to her race discrimination claim, Hill contends that she is similarly situated to Head, Craaybeek, Bauske and Wilson.  With regards to her gender discrimination claim, Hill contends that she is similarly situated to Head, Rogers, Williams, Craaybeek, and Bauske. And, with regards to her age discrimination claim, Hill contends that she is similarly situated to Wilson and Rogers.

Head is not similarly situated to Hill because Head had worked for Brink's for 33 years, and had only 3 accidents throughout his employment, as opposed to Hill, who had only been employed for four years, but had incurred two accidents and a Driver's Alert report.

Craaybeek is not similarly situated to Hill because, although he had three accidents prior to his termination, none of those accidents resulted in costs to Brink's as staggering as those arising from Hill's June 30, 2003, accident.  But, even if Craaybeek was similarly

situated, he was not treated more favorably.  When he had an accident during Levin's tenure as branch manager, Levin reviewed his accident history, noted costs associated with a previous accident of $15,129.88, noted his length of employment (he began working at Brink's in July 1997) and terminated him.  Thus, Levin's treatment of Craaybeek was consistent with its treatment of Hill.

Bauske is not similarly situated to Hill either.  Although Bauske had three preventable accidents in seven months, Brink's did not terminate him until after his third accident because he had been a Brink's employee since July of 1965.  And, like Craaybeek, even if Bauske was similarly situated to Hill, it would not alter the outcome here, as Bauske was also terminated after an accident occurred while Levine was branch manager (albeit his second), and was treated substantially similar to Hill.

Wilson is not similarly situated to Hill because the costs associated with Wilson's two preventable accidents were minor compared to Hill's, and the accidents Wilson was engaged in did not result in any injuries.

Rodgers is not similarly situated because, although he had three non-preventable accidents while Levine was branch manager, each involved his car being struck while it was parked, and the total costs incurred by Brink's was $15.  Therefore, the nature of the accidents and the cost associated with them prevent a finding that he is similarly situated.

Williams, who had one preventable accident when Levin was branch manager, and five preventable accidents total since 1998, but was not terminated, is also not similarly situated to Hill.   Nobody was injured in any of Williams' accidents, and the cost to Brink's as a result of Williams' accidents were not deemed significant.

Because Hill has not pointed to any individual outside of her protected classes that is similarly situated to her, each of her claims must fail.

<u>Pretext</u>

Where a plaintiff fails to establish a *prima facie* case of discrimination, the court need not analyze the issue of pretext.  *See Cowan v. Glenbrook Security Servs., Inc.,* 123 F.3d 438, 445 (7th Cir. 1997)("We need not reach the issue of pretext, as plaintiff has failed to state a *prima facie* case of discriminatory discharge under *McDonnell Douglas*.").  However, it is noted that Plaintiff has made no showing of pretext whatsoever, and her claim would fail even if she had met her *prima facie* burden.

To show pretext Hill must demonstrate either that a discriminatory reason more likely motivated the employer than the stated reason, or that the employer's proffered explanation for its action is not worthy of credence.  *See Texas Dept of Community Affairs v. Burdine*, 450 U.S. 248, (1981).  The Seventh Circuit has repeatedly indicated that it will not sit as a super personnel department, and

will not reexamine business decisions. *Billups v. Methodist Hosp.*, 922 F.2d 1300, 13094 (7th Cir. 1991); *Smith v. General Scanning, Inc.*, 876 F.2d 1315, 1321 (7th cir. 1989); *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986).

Defendant's reasons for terminating Hill may be foolish trivial or even baseless without violating the law. *See Hartley v. Wis. Bell., Inc.*, 124 F.3d 887, 890 (7th Cir. 1997). The reasons for Plaintiff's termination are not scrutinized as to whether they were right or wrong, but only "whether the reason for which the [employer] discharged the [employee] was discriminatory." *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

Hill has made no showing that Defendant (and it's decision maker, Levine) did not honestly lose confidence in Hill's ability to drive safely. Hill does note that her termination letter (which is not cited) indicates that Brink's had not yet determine the extent of the damages from Hill's second accident, but that "preliminary reports indicated that there will be a significant cost to the branch." (*See* Hill's Response Brief at 13). In fact, the police report entitled from the September 24, 2004, accident states "Insufficient Property Damage" and describes the damage as "Driver's side torn signal assembly." (Pl.'s Ex. A). While this may show that Defendant was in error about the amount of loss it would sustain from the September 24, 2004, accident, pretext requires a greater showing than this.

There is no evidence that Defendant's proffered reason for

terminating Hill is discriminatory.  In sum, this Court cannot say that either race, gender or age tipped the balance in favor of Plaintiff's discharge or that Defendant did not reasonably believe the reasons for discharging her.  Because Plaintiff is unable to establish Defendant's reason for Plaintiff's discharge was pretextual, Plaintiff's race, gender and age claims fail.


CONCLUSION

For the reasons set forth above, Defendant Brink's, Incorporated's Motion for Summary Judgment is **GRANTED**.  The Clerk is **ORDERED** to **DISMISS** this case with prejudice.


DATED:  November 3, 2006              /s/RUDY LOZANO, Judge
                                     United States District Court